UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

SARAH J. MARSHALL,

      Plaintiff,

v.                              CASE NO. 3:20-cv-1008-MCR

ACTING COMMISSIONER OF
THE SOCIAL SECURITY
ADMINISTRATION,

      Defendant.
_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative decision denying her application for a period of disability and disability insurance benefits ("DIB"), alleging disability beginning January 1, 2018. Following an administrative hearing held on November 18, 2019, the assigned Administrative Law Judge ("ALJ") issued a decision, finding Plaintiff not disabled from January 1, 2018, the alleged disability onset date, through January 21, 2020, the date of the ALJ's decision.[2] (Tr. 15-23.) Based on a review of the record, the briefs, and the applicable law, the

_____

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. (Doc. 17.)

[2] Plaintiff had to establish disability on or before December 31, 2022, her date last insured, in order to be entitled to a period of disability and DIB. (Tr. 15.)

Commissioner's decision is **REVERSED and REMANDED** under sentence four of 42 U.S.C. § 405(g).

## I.   Standard of Review

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

2

## II.      Discussion

### A.      Issues on Appeal

Plaintiff raises four issues on appeal.  First, she argues that the ALJ
failed to review Plaintiff's record in its entirety, alleging that the ALJ failed
to obtain Plaintiff's medical records from out-of-state providers.  (Doc. 25 at
13-14.)  Plaintiff's second argument is that the ALJ erred in his review of
Plaintiff's record, alleging that the ALJ disregarded diagnostic studies, notes
from Plaintiff's physicians, and Plaintiff's own subjective complaints, and
instead relied on "his own opinions regarding Plaintiff's conditions,"
unrelated notes in Plaintiff's record, and the opinion of the State agency
physician.  (*Id.* at 14-17.)  Due to this error, Plaintiff contends that "it is
impossible to show that [the ALJ's] denial is supported by any evidence, let
alone a substantial amount."  (*Id.* at 15.)  Plaintiff's third, albeit brief,
argument is that the ALJ failed to discuss the requirements of the SSA
listing under epilepsy.  (*Id.* at 17-18.)  Finally, Plaintiff argues that the ALJ
failed to mention several of Plaintiff's other impairments, diagnostic history,
medication history, "and the symptomology thereof."  (*Id.* at 19-24.)
According to Plaintiff, the ALJ's failure to consider the totality of Plaintiff's
conditions rendered the ALJ's questioning of the vocational expert incomplete
and the formulation of the residual functional capacity ("RFC") "impossible."
(*Id.* at 24.)

Defendant responds that Plaintiff "makes conclusory assertions throughout her brief," many of which misrepresent the record and are "wholly meritless." (Doc. 29 at 4-5.) Defendant contends that substantial evidence supports the ALJ's RFC finding, the ALJ's subjective complaint analysis, and the Commissioner's ultimate decision. (*Id.* at 7-19.) According to Defendant, the ALJ's decision complied with the proper legal standards and should be affirmed. (*Id.* at 19.)

### B. Standard for Evaluating Opinion Evidence and Subjective Symptoms

The ALJ is required to consider all the evidence in the record when making a disability determination. *See* 20 C.F.R. § 404.1520(a)(3). With regard to medical opinions, the rules in 20 C.F.R. § 404.1520 apply to claims filed on or after March 27, 2017.[3] *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 F.R. 5844-01, 2017 WL 168819 (Jan. 18, 2017). Because Plaintiff's claim was filed after March 27, 2017, the Court applies the revised rules and regulations in effect at the time of the ALJ's decision.

Under the revised rules and regulations, the ALJ need "not defer or give any specific evidentiary weight, including controlling weight, to any

---

[3] The rules in 20 C.F.R. § 404.1527 apply to claims filed before March 27, 2017.

4

medical opinion(s) . . . , including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). The ALJ will articulate in the administrative decision how persuasive all of the medical opinions are in the case record, 20 C.F.R. § 404.1520c(b), but need not articulate how evidence from non-medical sources has been considered, 20 C.F.R. § 404.1520c(d).

"When a medical source provides one or more medical opinions," those opinions will be considered "together in a single analysis," using the factors listed in 20 C.F.R. § 404.1520c(c)(1) through (c)(5), as appropriate. 20 C.F.R. § 404.1520c(a), (b)(1). The ALJ is "not required to articulate how [he/she] considered each medical opinion . . . from one medical source individually." 20 C.F.R. § 404.1520c(b)(1).

When evaluating the persuasiveness of medical opinions, the most important factors are supportability[4] and consistency.[5] 20 C.F.R. § 404.1520c(a), (b)(2). Thus, the ALJ "will explain how [he/she] considered the supportability and consistency factors for a medical source's medical opinions" in the determination or decision but is not required to explain how

---

[4] "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1).

[5] "The more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. § 404.1520c(c)(2).

he/she considered the rest of the factors listed in 20 C.F.R. § 404.1520c(c).  20 C.F.R. § 404.1520c(b)(2).  When "two or more medical opinions . . . about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same," the ALJ will articulate how he/she considered the other most persuasive factors listed in 20 C.F.R. § 404.1520c(c)(3) through (c)(5), which include a medical source's relationship with the claimant,[6] specialization, and other factors.[7]  20 C.F.R. § 404.1520c(b)(3).

When a claimant seeks to establish disability through her own testimony of pain or other subjective symptoms, the Eleventh Circuit's three-part "pain standard" applies.  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (per curiam).  "If the ALJ decides not to credit such testimony, he [or she] must articulate explicit and adequate reasons for doing so."  *Id.*

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition

---

[6] The relationship with the claimant factor combines consideration of the following issues: the length of the treatment relationship, the frequency of the examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and the examining relationship.  20 C.F.R. § 404.1520c(c)(3)(i)-(v).

[7] The other factors may include: the medical source's familiarity with the other evidence in the claim; the medical source's understanding of the disability program's policies and evidentiary requirements; and the availability of new evidence that may render a previously issued medical opinion more or less persuasive.  20 C.F.R. § 404.1520c(c)(5).

is of such a severity that it can be reasonably expected to give
rise to the alleged pain.

*Id.*

Once a claimant establishes that her subjective symptom is disabling

through "objective medical evidence from an acceptable medical source that

shows . . . a medical impairment(s) which could reasonably be expected to

produce the pain or other symptoms," pursuant to 20 C.F.R. § 404.1529(a),

"all evidence about the intensity, persistence, and functionally limiting effects

of pain or other symptoms must be considered in addition to the medical

signs and laboratory findings in deciding the issue of disability," *Foote*, 67

F.3d at 1561.  *See also* SSR 16-3p[8] (stating that after the ALJ finds a

medically determinable impairment exists, the ALJ must analyze "the

intensity, persistence, and limiting effects of the individual's symptoms" to

determine "the extent to which an individual's symptoms limit his or her

ability to perform work-related activities").

As stated in SSR 16-3p:

> In considering the intensity, persistence, and limiting
> effects of an individual's symptoms, [the ALJ must] examine the
> entire case record, including the objective medical evidence; an
> individual's statements about the intensity, persistence, and
> limiting effects of symptoms; statements and other information

---

[8] SSR 16-3p rescinded and superseded SSR 96-7p, effective March 28, 2016,
eliminating the use of the term "credibility," and clarifying that "subjective
symptom evaluation is not an examination of an individual's character."  SSR 16-3p.

provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

. . .

In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent." It is also not enough for our adjudicators simply to recite the factors described in the regulations for evaluating symptoms.[9] The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

. . .

In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person. Rather, our adjudicators will focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities[.]

SSR 16-3p.

---

[9] These factors include: (1) a claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the claimant's pain or other symptoms; (5) any treatment, other than medication, received by the claimant to relieve the pain or other symptoms; (6) any measures (other than treatment) used to relieve the pain or other symptoms (*e.g.*, lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 16-3p.

"[A]n individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed" will also be considered "when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities." *Id.* "[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, [the adjudicator] may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." *Id.* However, the adjudicator "will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." *Id.* In considering an individual's treatment history, the adjudicator may consider, *inter alia*, one or more of the following:

- That the individual may have structured his or her activities to minimize symptoms to a tolerable level by avoiding physical activities or mental stressors that aggravate his or her symptoms;
- That the individual may receive periodic treatment or evaluation for refills of medications because his or her symptoms have reached a plateau;
- That the individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms;
- That the individual may not be able to afford treatment and may not have access to free or low-cost medical services;
- That a medical source may have advised the individual that

there is no further effective treatment to prescribe or recommend that would benefit the individual;

- That due to various limitations (such as language or mental limitations), the individual may not understand the appropriate treatment for or the need for consistent treatment.

*Id.*

### C.   Relevant Evidence

#### 1.   Plaintiff's Medical Evidence

The following relevant evidence, covering the period from March 2018 through October 2019, was submitted to the ALJ regarding Plaintiff's physical impairments.  At the outset, Plaintiff's history of epilepsy is noted throughout her treatment notes and medical records.  (*See* Tr. 303, 312, 316, 320, 335-36, 338, 346-49, 351, 361.)

Since June 2018, Plaintiff was treated by Dr. Ortolani, who noted generalized idiopathic epilepsy and epileptic syndromes.  (Tr. 312-14, 336.) Dr. Ortolani increased the dosage of Plaintiff's medication, Keppra, due to "breakthrough seizures."  (Tr. 313.)  Dr. Ortolani noted that Plaintiff was "having her seizures in the morning," and directed her to "take most of the Keppra at bedtime."  (*Id.*)

At a follow-up appointment in July 2018, Dr. Ortolani noted that Plaintiff "continue[d] to have seizures between visits," and "report[ed] at least 3 since her last visit."  (Tr. 316.)  According to Dr. Ortolani's notes, since

starting Tegretol, Plaintiff "reported no seizures" and stated it seemed to be helping as she had "been seizure free for 10 days." (*Id*.)  Further notes indicate that Plaintiff was "tolerating her mediation well." (*Id*.)  However, an EEG performed two weeks after Plaintiff's July appointment revealed abnormal findings.  (Tr. 320.)

In August 2018, Plaintiff presented to the emergency department following a seizure-related injury.  (Tr. 303.)  She reported that she "ha[d] been having seizures once a week for the past year" and had "her usual seizure" in the days leading up to the emergency room presentation.  (*Id*.)  Plaintiff explained "she was going to the bathroom . . . [and] had another seizure causing her to fall face front." (*Id*.)  As a result, Plaintiff presented with a hematoma to her forehead.  (*Id*.)

In November 2018, Plaintiff returned to Dr. Ortolani.  (Tr. 333.)  The doctor's note reflects that Plaintiff "was last seen 7/23/18" and since then, she had been experiencing increasing random jerks daily, which lasted for two to three hours, and which were not severe, but still hindered her.  (*Id*.)  Despite Plaintiff's reported increase in "random jerks," Plaintiff was "[a]ble to complete the majority of routine daily tasks." (*Id*.)

In January 2019, Dr. Ortolani's follow-up note states, in relevant part:

> [Plaintiff] reports there has been no new major seizures since her last visit but there have been small mild episodes.  These usually take place close to [the] next scheduled dose of medication.  She

> reports these also increase around her menstrual cycle.  She
> states when this occurs[,] she just stares and has minor shaking
> with a little confusion and trouble speaking.

(Tr. 338.)  To address Plaintiff's reported complaints, Dr. Ortolani changed

her medication schedule, directing Plaintiff to "spread out the current dose of

[her] medication to 2 Keppra at 6am and 1 Keppra at 6pm along with 2

Tegretol at 6 am and 2 Tegretol at 6 pm." (*Id*.)  Plaintiff was also given a

water pill to take the week before her menstrual cycle.  (*Id*.)  Plaintiff denied

any unwanted side effects from the medication, and reported no over-

sedation, poor coordination, aberrant behaviors or mood changes.  (*Id*.)

Plaintiff followed up with Dr. Ortolani in March 2019.  (Tr. 336.)  At

that appointment, she stated that the "medication [was] working to keep the

majority of [the] seizures under control." (*Id*.)  However, Plaintiff still

suffered from seizures approximately twice a week.  (Tr. 337.)  Plaintiff

denied any untoward side effects and was compliant with the medication as

prescribed.  (Tr. 336.)  Plaintiff reported she was "able to handle the activities

of daily living without assistance." (*Id*.)  Also, a functional assessment form,

completed by Plaintiff that month provides that she did not "need help with"

activities, such as grooming, dressing, shopping, performing housework,

preparing meals, feeding, walking, bathing, and getting in and out of chairs.

(Tr. 361.)

In the fall of 2019, Plaintiff had several appointments at the Orlando

Epilepsy Center. (Tr. 346-49.) The note from her September 2019 visit states that her seizures were "triggered by stress where [she] would have almost daily seizure[s] during stressful time[s]." (Tr. 349.) It also states that Plaintiff "was seizure free for about 1 year until August 2019 [when] she was under tremendous stress" due to her husband losing his job. (*Id*.) Plaintiff reported bodily jerks three to four times per week, and associated staring spells. (*Id*.) Notably, during this visit, Plaintiff's eyes rolled "to [the] right side involuntarily and she lost awareness during [the] exam." (Tr. 351.) However, it was noted that Plaintiff "was without any seizure symptoms since her Tegretol was switched to Topamax." (Tr. 329.)

In September 2019, Plaintiff underwent another EEG, which also revealed abnormal findings. (Tr. 352.) On October 15, 2019, approximately three weeks after her last visit, Plaintiff returned to the Orlando Epilepsy Center, but reported no seizures since her last appointment. (Tr. 346.)

## 2.   **Hearing Testimony**

Plaintiff appeared by counsel at the November 18, 2019 hearing before the ALJ. (Tr. 30-69.) At the outset, the ALJ asked Plaintiff's counsel if Plaintiff's records were "complete and up-to-date," to which counsel responded affirmatively. (Tr. 36.) Plaintiff's counsel then stated that "the limited amount of medical records are due to our joined [sic] inability to get medical records from [Plaintiff's] previous state[s] of Wisconsin . . . [a]nd New

York." (*Id.*)  When asked if there were any outstanding, relevant records "during the pertinent period" between January 1, 2018 and the hearing date, Plaintiff's counsel responded in the negative.  (*Id.*)  The ALJ then asked if he needed to "intervene to get those records" and whether, between January and April 2018, "there [was] something really, really important there missing," to which Plaintiff's counsel responded, "Oh, no."  (Tr. 37.)

Plaintiff testified, in relevant part, that she suffered a grand mal seizure the night before the hearing, and had one seizure per week in September.  (Tr. 38.)  Plaintiff also testified that migraines followed her seizures and that they were "severe" and "disabling," and that she needed "to sleep [them] off until [they] finally [went] away, hours later." (*Id.*)  Plaintiff further testified that once she had a seizure, she also had a migraine and it took "a whole day to recover" from it.  (Tr. 39.)  Plaintiff stated that despite taking her medications, she was still having seizures on a regular basis.  (*Id.*)  She also stated that she did not drive because the State of New York had revoked her driver's license due to a seizure-related accident in 2017.  (Tr. 39, 54.)

In addition, Plaintiff testified that she taught online courses for about thirty-five hours per week and she had never suffered a seizure while teaching.  (Tr. 46-48.)  She stated that she was independent in self-care and was able to clean the house and perform basic chores, including meals, but

her husband did not want her "to work with knives or glassware" in the kitchen due to injury concerns.  (Tr. 55-56.)  Also, her husband had to either sit in the bathroom or stand outside the door when Plaintiff was taking a shower due to concerns related to falling.  (Tr. 41.)

### 3.    The ALJ's Decision

The ALJ issued his decision on January 21, 2020.  (Tr. 15-23.)  At step one of the sequential evaluation process,[10]  the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date.  (Tr. 17.)  At step two, the ALJ found that Plaintiff's epilepsy was a severe impairment.  (Tr. 17-18.)  The ALJ also discussed Plaintiff's diabetes and hypothyroidism, as well as her depression and anxiety, but found them to be non-severe.  (Tr. 18.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (Tr. 19.)

Then, prior to step four, the ALJ found that Plaintiff had the RFC to perform a reduced range of light work as follows:

> She can lift, carry, and push/pull twenty pounds occasionally and ten pounds frequently; she can stand/walk for six hours in an eight-hour workday; she can sit for six hours in an eight-hour workday; she can occasionally climb ramps and stairs; she can never climb ladders, ropes, or scaffolds; she can occasionally balance and stoop; she can frequently kneel, crouch, and crawl;

---

[10] The Commissioner employs a five-step process in determining disability. *See* 20 C.F.R. § 404.1520(a)(4).

she can never work in proximity to moving mechanical parts; she
can never work at high, exposed places; she is limited to work
that requires no interaction with crowds; however, she can work
frequently with the public, co-workers, and supervisors.

(*Id.*) The ALJ summarized some of the pertinent evidence as follows:

The medical evidence supports the restrictions identified in the
[RFC]. A summary of the claimant's medi[c]al history in October
of 2019 noted that the claimant had a significant history of
seizure disorder. She reported difficulties with focusing, memory
loss, and increase in stress and anxiety. (Exhibit 6-F, page 1[.])
The Claimant has had seizures since childhood. (Exhibit 2-F,
page 2[.]) In July of 2018, the claimant reported weekly seizures.
It was noted she suffered a fall related to a seizure. (Exhibit 1-F,
page 1[.]) She has had complaints of dizziness. (Exhibit 2-F,
page 2[.]) An EEG recording was described as abnormal.
However, there was no evidence of any focal or generalize[d]
slowing or asymmetry of background rhythms. Findings were
consistent with epilepsy. (Exhibit 6-F, page 7[.]) An MRI of the
brain showed flair in the left parasagittal and white frontal deep
matter with no enhancements. (Exhibit 8-F, page 1[.]) The
claimant reported in August of 2019 that she usually gets
seizures early in the morning. (Exhibit 8-F, page 1[.]) However,
the record does not document seizures on a daily basis.

Based on the claimant's epilepsy, the [ALJ] has included a
restriction to light exertion work, as well as limitation on
climbing, working at heights, and working with moving
mechanical parts.

As noted earlier, the claimant is not subject to severe mental
impairments. However, the [ALJ] included a restriction to
working in crowds based on the claimant's epilepsy.

Despite the allegation of disability, it is noted that the record
contains some examinations with relatively unremarkable
findings. (Exhibit 3-F, page 3[.]) It was noted in July of 2018
that the claimant was alert and in no acute distress. She was
oriented to person, place, time, and situation. (Exhibit 1-F, page
3[.]) She had a steady gait. (Exhibit 1-F, page 4[.])

(Tr. 20.)

Further, the ALJ summarized the opinion of the State agency physician

who reviewed Plaintiff's record at the reconsideration level as follows:

> This source was of the opinion the claimant is able to work at the
> light exertion level. (Exhibit 3-A, page 10[.]) It was noted that
> she could never climb ladders, ropes, or scaffolds, but could
> perform unlimited climbing of ramps and stairs. (Exhibit 3-A,
> page 11[.]) It was noted that she should avoid concentrated
> exposure to vibration and hazards. (Exhibit 3-A, page 12[.]) It is
> noted that this opinion is consistent with other evidence, notably
> the claimant's history of treatment for epilepsy. (Exhibits 1-F, 2-
> F, 6-F, 8-F[.]) The opinion is also supported by this source's
> explanatory statements with references to the record. (Exhibit 3-
> A, pages 7 and 12[.]) The undersigned has found this opinion to
> be persuasive; however, the undersigned notes that the record as
> a whole is supportive of more limitations, including restrictions
> related to working around crowds and balancing restrictions.

(Tr. 20-21.)

Regarding Plaintiff's allegations and reported daily activities, the ALJ

made the following observations and findings:

> The claimant alleges that she is disabled and unable to work due
> to her impairments. She noted she has frequent seizures which
> leave her incapacitated for the day. She noted partial seizures
> three to four times per week that keep her from doing anything
> for several hours. (Exhibit 12-E, page 1[.]) However, this
> frequency and degree of seizures is not documented by this
> medical record.

> With respect to the claimant's allegations, the undersigned has
> considered the claimant's activities of daily living. The record
> indicates that the claimant is somewhat active. The claimant
> state in August 2019 that she was able to handle the activities of
> daily living without assistance. It was noted she was able to

17

complete the majority of routine daily tasks.  (Exhibit 8-F, page 1[.])  She noted she is able to clean, do laundry and pay bills.  (Exhibit 12-E, page 3[.])  She noted hobbies and interests[,] including reading, crocheting, playing the piano and watching television.  (Exhibit 12-E, page 5[.])  She stated she goes to church on Sundays.  (Exhibit 12-E, page 5[.])

It was noted in September of 2018 that the claimant was able to play piano for her church and at home and did not have any real issues playing the piano.  The claimant stated that she loved to play the piano and teach people how to play the piano.  She indicated that she had no issues counting change, or balancing a checkbook.  She stated she handles the family budget and pays the bills.  She noted she was able to grocery shop but her husband had to drive[] since she was unable to [d]rive due to her seizure disorder.  It was noted she was able to prepare her own meals.  (Exhibit 1-A, page 7[.])  This level of activity is inconsistent with the claimant's allegation of disability.

(Tr. 21.)

Further, the ALJ reviewed Plaintiff's treatment history as follows:

The claimant has been prescribed medication appropriate for her established impairments.  However, the record does not suggest that she fails to receive significant relief of symptoms with the use of medication.  Medication has included Keppra.  (Exhibit 1-F, page 2[.])  Tegretol has been prescribed.  (Exhibit 2-F, page 5[.])  She has used Topamax.  (Exhibit 7-F, page 21[.])  The claimant reported that she was compl[ia]nt with medication and does not experience side effects.  (Exhibit 6-F, page 1[.])

(*Id.*)

As to Plaintiff's work history, the ALJ stated:

[T]he claimant has engaged in considerable work activity since her alleged onset of disability, some of it near the level considered to be substantial gainful activity; the claimant testified that she currently earns $1,000 per month.  This evidence contradicts the claimant's statements that she believes she is unable to work.

18

(*Id*.)  Ultimately, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 21-22.)

At step four, the ALJ found that Plaintiff was unable to perform any of her past relevant work.  (Tr. 22.)  At the fifth and final step, the ALJ determined that there were jobs existing in significant numbers in the national economy that Plaintiff could perform, such as a mail clerk, a garment sorter, and an office helper.  (Tr. 22-23.)

### D.    Analysis

Turning to Plaintiff's second argument on appeal, the Court finds the ALJ's statements related to Plaintiff's medical record and subjective complaints are not supported by substantial evidence in the record.  The ALJ found that while Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were "not entirely consistent with the medical evidence and other evidence of record."  (Tr. 21-22.)  While the ALJ acknowledged Plaintiff's "significant history of seizure disorder" since childhood and noted the abnormal EEG

findings, the ALJ also underscored what he deemed to be "unremarkable findings" in Plaintiff's record. (Tr. 20.) For example, the ALJ underscored Plaintiff's steady gait, lack of acute distress, and ability to remain alert. (Tr. 20, 303-06, 327.) These unremarkable findings, however, do not necessarily relate to Plaintiff's epilepsy and/or to the symptoms and limitations from her condition. The ALJ also emphasized that the record did "not document seizures on a daily basis" (Tr. 20); however, neither Plaintiff nor her medical providers have claimed that she suffered from daily seizures.

In addition to underscoring findings unrelated to Plaintiff's epilepsy and resulting limitations, the ALJ made statements that are not supported by the record. In discussing Plaintiff's allegations, the ALJ stated:

> The claimant alleges that she is disabled and unable to work due to her impairments. She noted she has frequent seizures which leave her incapacitated for the day. She noted partial seizures three to four times per week that keep her from doing anything for several hours. . . . However, this frequency and degree of seizures is not documented by this medical record.

(Tr. 21.) Contrary to the ALJ's statement, the frequency and degree of seizures alleged by Plaintiff are documented in the record. The record is replete with on-going treatment notes from Dr. Ortolani and physicians at the Orlando Epilepsy Center, showing longitudinal records related to enduring, frequent seizures. (Tr. 312-14, 316-17, 320, 333, 335-38, 346-49, 352, 361.) Between June 2018 and March 2019, Plaintiff was seen by Dr.

Ortolani at least five times, reporting for follow-up appointments as directed. (Tr. 312-14, 316-17, 333, 336, 338.)  Dr. Ortolani repeatedly referenced Plaintiff's "breakthrough seizures" and "jerks [that] occur daily."  (Tr. 312-14, 333.)  Contrary to the ALJ's findings, Plaintiff's medical records show frequent seizures, leaving Plaintiff incapacitated for the day, along with partial seizures or "random jerks" three to four times a week.

While, at times, the record shows periods of no seizures, such periods seem to be temporary and unpredictable.  For example, in January 2019, Dr. Ortolani noted that Plaintiff suffered "no new major seizures since her last visit," but underscored that Plaintiff still suffers "mild episodes."  (Tr. 338.) Despite some improvement in the frequency of her seizures, the record shows that Plaintiff continued to have weekly seizures.  For example, treatment notes from March 2019 show that Plaintiff's medication "[b]rought [the] seizures [down] from 3-4 [times] a week, to [two times] a week."  (Tr. 337.) The treatment notes from September 2019 show that Plaintiff was having multiple seizures per week, with "bodily jerks" three to four times a week. (Tr. 349.)  Moreover, Plaintiff's medical record shows confusion and "crying spells" associated with the seizures, as well as Plaintiff biting her tongue and suffering head-related trauma as a result of seizure-related falls.  (Tr. 303-04, 338, 349.)  As such, the ALJ's statement that the "frequency and degree of seizures is not documented by [the] medical record" is not supported by

21

substantial evidence.

The ALJ also reviewed Plaintiff's course of treatment and use of
prescription medications, highlighting that Plaintiff "ha[d] been prescribed
medication appropriate for her established impairments." (Tr. 21.) The ALJ
went on to state, however, that the "record [did] not suggest that [Plaintiff]
fail[ed] to receive significant relief of symptoms with the use of medication,"
and cited her medication compliance and lack of adverse side effects. (*Id.*)
Although Plaintiff was routinely prescribed medication like Topamax,
Keppra, and Tegretol, was compliant with it, and suffered no adverse side
effects, substantial evidence does not support the ALJ's statement that "the
record [did] not suggest that [Plaintiff] fail[ed] to receive significant relief of
symptoms with use of medication." (*Id.*)

For example, in June 2018, Dr. Ortolani noted that an increase of
Keppra was required "as [Plaintiff was] having breakthrough seizures." (Tr.
312-14.) A month later, in July 2018, Plaintiff reported no seizures since
starting her new medication, but by November 2018, she stated that since
her last visit, her random jerks had increased. (Tr. 316, 333.) In March
2019, Dr. Ortolani noted that although Plaintiff's "medication [was] working
to keep the majority of [her] seizures under control," Plaintiff still
experienced seizures twice a week. (Tr. 336-37.) In August 2019, Plaintiff
continued to report weekly seizures and frequent bodily jerks, resulting in

22

confusion.  (Tr. 329.)  Thus, the ALJ's review of Plaintiff's medical treatment and efficacy of medications is not supported by substantial evidence.

Further, the hearing testimony supports the observations and findings in the medical records, including the recent increase in seizures and bodily jerks and the resulting injuries to Plaintiff.  (*See, e.g.*, Tr. 38 (noting Plaintiff's seizure from the night before the hearing and Plaintiff's weekly seizures since September 2019); Tr. 40-41 (discussing Plaintiff's injuries from a seizure that happened in the shower).)

In sum, the ALJ's statement that Plaintiff's subjective complaints related to the "intensity, persistence, and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record" is not supported by substantial evidence.  Of note, immediately prior to discrediting Plaintiff's allegations related to the intensity and limiting effects of her symptoms, the ALJ also made the following statement, which is inconsistent with the rest of the ALJ's opinion: "Based on this discussion, the undersigned finds that the claimant's allegations are reasonably consistent with the medical evidence and other evidence in the record."  (Tr. 21.)  Furthermore, the ALJ only broadly and indirectly referred to Plaintiff's medical record, and did not mention any specific medical provider in the decision.  The ALJ only assessed the persuasiveness of one State agency, non-examining physician and generically stated that the

23

"opinion [was] consistent with other evidence" and "supported by this source's explanatory statements with references to the record," without providing more specific reasons for finding the opinion to be persuasive.  (Tr. 20.)

Therefore, on remand, the ALJ will have an opportunity to reconsider Plaintiff's subjective complaints and medical records, and explain how any medical opinions in those records have been assessed.  In light of this conclusion, it is unnecessary to address Plaintiff's remaining arguments.  *See Jackson v. Bowen*, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (per curiam); *Freese v. Astrue*, No. 8:06-cv-1839-T-EAJ, 2008 WL 1777722, *3 (M.D. Fla. Apr. 18, 2008); *see also Demenech v. Sec'y of the Dep't of Health & Hum. Servs.*, 913 F.2d 882, 884 (11th Cir. 1990) (per curiam).

Accordingly, it is **ORDERED**:

1.     The Commissioner's decision is **REVERSED** pursuant to sentence four of 42 U.S.C. § 405(g) and **REMANDED** with instructions to the ALJ to (a) reconsider Plaintiff's subjective complaints and Plaintiff's medical records, including those from Dr. Ortolani and the Orlando Epilepsy Center, and explain how any medical opinions in those records have been assessed; (b) reconsider the RFC assessment, if necessary; and (c) conduct any further proceedings deemed appropriate.

2.     The Clerk of Court is directed to enter judgment consistent with this Order, terminate any pending motions, and close the file.

3.     The judgment should state that if Plaintiff were to ultimately prevail in this case upon remand to the Social Security Administration, any § 406(b) or § 1383(d)(2) fee application must be filed within the parameters set forth by the Standing Order on Management of Social Security Cases entered in *In re: Administrative Orders of the Chief Judge*, Case No.: 3:21-mc-1-TJC (M.D. Fla. Dec. 7, 2021).

**DONE AND ORDERED** at Jacksonville, Florida, on March 15, 2022.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record